IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Melissa Dellinger, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 6:14-1150-DCN-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on August 12, 2011, alleging that she became unable to work on December 3, 2003. The applications were denied initially and on reconsideration by the Social Security Administration. On April 13, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Karl S. Weldon, an impartial vocational expert, appeared on September 13, 2013,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on October 18, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on January 28, 2014 (Tr. 1-3). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

(2)    The claimant has not engaged in substantial gainful activity since December 3, 2003, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: chronic obstructive pulmonary disease/asthma, obesity, diabetes mellitus, peripheral neuropathy, superior labral tear from anterior to posterior (hereinafter referred to as SLAP tear) of the left shoulder, migraine headaches, anxiety, and depression (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). except for limitations in stooping, kneeling, crouching, crawling, and climbing ladders, scaffolds, and ropes on more than an occasional basis, using her fingers for fine manipulation and handling objects more than frequently, frequently balance and needing to avoid concentrated exposure to fumes and hazards. From a mental standpoint, she is able to carry out simple, one-to-two step tasks.

(6)    The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

2

(7)    The claimant was born on November 17, 1973, and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has the equivalent of a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)   The claimant has not been under a disability, as defined in the Social Security Act, from December 3, 2003, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

3

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456

(4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### EVIDENCE PRESENTED

On September 25, 2003, James Bridgeman, Jr., M.D., evaluated the plaintiff for multiple problems including chronic headaches, anxiety, and insomnia.  He refilled the plaintiff's Fiorinal and Klonopin (Tr. 448).

On June 5, 2006, Dr. Bridgeman evaluated the plaintiff for follow-up of hypertension that had begun with the birth of her child 18 months prior.  He also noted that the plaintiff was having increased anxiety and insomnia.   Dr. Bridgeman prescribed Atenolol, HCTZ, and Trazodone (Tr. 428-29).

On March 14, 2007, Dr. Bridgeman diagnosed worsening generalized anxiety and worsening hypertension.  He prescribed Lotensin and Prozac (Tr. 426-27).

At a September 12, 2007 visit, Dr. Bridgeman noted that the plaintiff's blood pressure, depression, and anxiety were stable, but she still had carpal tunnel type symptoms that were unrelieved with splints, NSAIDs, and stretching. He diagnosed bilateral carpal tunnel syndrome and recommended referral to the orthopedic clinic (Tr. 424-25). The plaintiff reported that she occasionally used alcohol and smoked half a pack of cigarettes a day. On examination, Dr. Bridgeman noted that the plaintiff had clear lungs to auscultation; she had no joint swelling, deformity, or edema; she was alert and oriented with no focal signs; and she was anxious, but otherwise within normal limits (Tr. 424, 426, 428). The plaintiff was prescribed Lotensin (used to treat high blood pressure), Prozac (antidepressant), Atenolol (beta-blocker), HCTZ (thiazide diuretic), and Klonopin (benzodiazepine) (Tr. 427). The plaintiff also was referred to orthopedics for her carpal tunnel like symptoms (Tr. 425).

On March 11, 2008, the plaintiff had elevated blood sugar. Dr. Bridgeman noted a new diagnosis of type II diabetes. He started the plaintiff on Janumet and Humalog (Tr. 324-25). On March 18, 2008, the plaintiff's blood sugars were down to the low 200s on insulin, and she was diagnosed with diabetes, type II, improving. Her medications were refilled. (Tr. 322-23). On April 16, 2008, the plaintiff reported that her blood sugars were down to the mid 150-180s. Dr. Bridgeman's impression was type II diabetes, uncontrolled and unchanged. He switched the plaintiff's Janumet to Metformin and refilled the plaintiff's Glucophage and Prozac (Tr. 320-321}.

On July 8, 2008, the plaintiff complained of increased situational stress. Dr. Bridgeman discussed diet and lifestyle behaviors with the plaintiff and reviewed and renewed her medications (Tr. 318-19). On October 7, 2008, Dr. Bridgeman indicated that the plaintiff's blood sugars were under better control, and her anxiety and depression symptoms were controlled. The plaintiff reported some numbness and tingling in her fingers and toes. Dr. Bridgeman assessed improving diabetes and hypertension. He

adjusted the plaintiff's medications and added a trial of Neurontin for possible peripheral neuropathy (Tr. 316-17).

On January 6, 2009, Dr. Bridgeman evaluated the plaintiff for her diabetes and worsening depression.  Dr. Bridgeman reviewed and adjusted the plaintiff's medications including prescribing Xanax and Zoloft (Tr. 314-15).  On April 6, 2009, the plaintiff continued to struggle with anxiety and depression.  She reported having difficulty leaving her home environment and difficulty interacting in public.  Dr. Bridgeman ordered blood work (Tr. 312-13).

On May 27, 2009, the plaintiff complained of several days of cough and congestion.  Dr. Bridgeman noted that the plaintiff had scattered wheezing in her chest. The plaintiff was advised to quit smoking.  Dr. Bridgeman reviewed and renewed the plaintiff's medications (Tr. 310-11).  On July 6, 2009, the plaintiff's depression was stable, and she had no chest pain or shortness of breath.  Dr. Bridgeman ordered blood work and prescribed Novolin and Xanax (Tr. 308-09).

On August 7, 2009, Dr. Bridgeman evaluated the plaintiff's diabetes at a follow-up.  The plaintiff continued to have neuropathic pain in her feet and extremities.  She reported that she had not seen any difference with use of Neurontin and that her insurance would not cover Lyrica.  The plaintiff reported that her chronic pain prevented her from walking, standing, sitting, or using her upper body for more than one to two consecutive hours.  The plaintiff reported having difficulty driving and taking care of her daily activities. Dr. Bridgeman indicated that the plaintiff appeared depressed and had decreased sensation in a stocking glove pattern in her hands and feet.  Dr. Bridgeman indicated that he completed a disability form.  He continued the plaintiff's current medications and advised an increase in physical activity and weight loss (Tr. 306-07).

On September 24, 2009, Dr. Bridgeman evaluated the plaintiff for several days of cough, congestion, and wheezing.  He noted that her blood sugars and anxiety

were poorly controlled. On examination, the plaintiff had lower lobe wheezing and decreased sensation in a stocking glove pattern in her hands and feet. Dr. Bridgeman also noted the plaintiff appeared depressed. Dr. Bridgeman reviewed and adjusted the plaintiff's medications (Tr. 304-05). On October 6, 2009, Dr. Bridgeman evaluated the plaintiff for increased cough and wheezing. The plaintiff reported that she was no longer smoking. Her depression, anxiety, and blood sugars appeared to be under control. Dr. Bridgeman reviewed and filled the plaintiff's medications (Tr. 302-03).

On December 29, 2009, the plaintiff was treated for an asthma flare-up and elevated blood sugar. Dr. Bridgeman noted that the plaintiff had decreased sensation in a stocking glove pattern in her hands and feet. The plaintiff also appeared depressed, and her wheezing was worse. He reviewed and adjusted her medications (Tr. 300-01)

On January 5, 2010, Dr. Bridgeman evaluated the plaintiff for complaints of general aches, fatigue, occasional night sweats, and tingling pain in her feet and hands. The plaintiff reported that her wheezing had improved and that her anxiety and depression were stable overall. Examination showed scattered wheezing and decreased sensation in a stocking glove pattern in the plaintiff's hands and feet. Dr. Bridgeman added peripheral neuropathy, hypercalcemia, and abnormal liver function tests to the plaintiff's diagnoses and refilled her medications (Tr. 297-99). On January 21, 2010, the plaintiff had worsening cough and wheezing. She appeared depressed and had decreased sensation in a stocking glove pattern on her hands and feet. Dr. Bridgeman reviewed and adjusted the plaintiff's medications (Tr. 390-92). On January 26, 2010, Dr. Bridgeman noted that, overall, the plaintiff's breathing and wheezing were better. On January 29, 2010, the plaintiff had chest x-rays that showed hypoinflation with left mid-lung patchy pneumonitis (Tr. 330).

On February 9, 2010, Dr. Bridgeman evaluated the plaintiff's asthma and noted that her wheezing had resolved, her blood sugars had improved, and her anxiety and

8

depression were stable.  He ordered blood work and discussed diet and exercise (Tr. 386-87).

On April 6, 2010, Dr. Bridgeman evaluated the plaintiff for moderate allergy and depressive symptoms.  He noted that the plaintiff's diabetes and hypertension were under moderate control.  Dr. Bridgeman added "depression, major, re-current" to the plaintiff's diagnoses.  He adjusted the plaintiff's medications including switching her from Zoloft to Celexa (Tr. 382-84).  On June 1, 2010, the plaintiff complained of a sudden onset of chest wall pain beginning several weeks earlier.  The plaintiff continued to have a cough and pain with deep breathing.  Dr. Bridgeman ordered x-rays and prescribed Lortab and Effexor (Tr. 380-81).

On June 3, 2010, the plaintiff had chest x-rays that showed a right ninth rib fracture and a right eighth rib subacute fracture (Tr. 328).  The plaintiff was reevaluated on July 6, 2010, and she indicated that her rib pain and asthma were better.  The plaintiff appeared depressed, and she had decreased sensation in a stocking glove pattern in her hands and feet.  Dr. Bridgeman reviewed and renewed her medication including Asmanex Inhaler, Lortab, and Xanax (Tr. 378-79).

On September 12, 2010, Dr. Bridgeman evaluated the plaintiff for cough and sinus drainage (Tr. 376-77).  On October 22, 2010, the plaintiff complained of possible strep throat and fatigue.  Dr. Bridgeman prescribed medication for pharyngitis and throat pain (Tr. 373-75).

On November 3, 2010, Dr. Bridgeman evaluated the plaintiff for chronic pain from fibromyalgia.  Dr. Bridgeman indicated that the plaintiff's blood sugars were controlled, and her asthma was stable.  It was noted that the plaintiff was not smoking.  Dr. Bridgeman ordered blood work and adjusted the plaintiff's medications (Tr. 370-72).  On November 11, 2010, the plaintiff had a recheck of anemia and chronic pain.  Dr. Bridgeman reviewed the plaintiff's blood work results and indicated that her impairments were unchanged and stable

9

(Tr. 366-69).    On November 17. 2010, during a re-check of the plaintiff's anemia, Dr. Bridgeman noted that it was worsening and referred her to a gastroenterologist (Tr. 364-65).

On November 18, 2010, Devena Alston-Johnson, M.D., of Upstate Oncology, initially evaluated the plaintiff for anemia.  The plaintiff reported feeling fatigued for several years with worsening symptoms over the prior six months.  The plaintiff also reported problems with nausea since starting oral iron.  Dr. Alston-Johnson noted that the plaintiff had headaches several times each week.  The plaintiff had pitting edema in both ankles, mild swelling in the dorsum of both hands, and tenderness to palpation in her middle back. Dr. Alston-Johnson diagnosed iron deficiency anemia secondary to chronic blood loss of an unknown source and recommended Venofer (IV iron) since the plaintiff could not tolerate oral iron and a folate supplement (Tr. 350-52).  On December 2, 2010, the plaintiff reported nausea and pruritus after taking Venofer.  She was advised to follow-up after her next two doses of Venofer (Tr. 347-49).  On December 16, 2010, the plaintiff was noted to have continued nausea with IV iron despite nausea medication, and IV iron treatment was stopped (Tr. 344-46).  Dr. Alston-Johnson also reevaluated the plaintiff and ordered blood work (Tr. 468-70).

On January 5, 2011, the plaintiff had an eye examination due her diabetes. The plaintiff reported occasionally seeing "stars" or "glittery light" (Tr. 332).

On January 13, 2011, Dr. Alston-Johnson evaluated the plaintiff, who reported not feeling well, being very tired and weak, and having head and neck pain.  Dr. Alston-Johnson diagnosed alopecia, fatty liver, and iron deficiency anemia and ordered blood work (Tr. 341-43).

On January 13, 2011, Dr. Bridgeman evaluated the plaintiff for upper respiratory symptoms.  Her blood sugars were reported to be running in the 130-150s.  Dr. Bridgeman noted that the plaintiff was anxious.  He renewed her medications including Hycodan, Tramadol, Xanax, and Zithromax (Tr. 361-63).  On April 14, 2011, the plaintiff

complained of bronchitis and uncontrolled blood sugar. The plaintiff reported that her anxiety was stable. Dr. Bridgeman ordered blood work and renewed the plaintiff's medications (Tr. 358-60).

On May 16, 2011, at an evaluation with Dr. Alston-Johnson, the plaintiff reported early satiety, nausea with poor appetite, and some sweating all the time, which remained unchanged. She also reported fatigue and trouble keeping up with her seven year old son. Based on the plaintiff's reports of sweats and fatigue, Dr. Alston-Johnson indicated that the plaintiff needed further work-up to exclude lymphoma (Tr. 338-40).

On June 10, 2011, the plaintiff reported falling and injuring her face, but said that her cheek and eye were doing better. Dr. Johnson reviewed the plaintiff's blood work and advised her to continue with folic acid and a high-iron diet (Tr. 336-37).

On July 14, 2011, Dr. Bridgeman evaluated the plaintiff for anxiety, depression, diabetes, and asthma. The plaintiff reported some increase in headaches and chronic neck and back pain that Dr. Bridgeman indicated was consistent with fibromyalgia. The plaintiff had started smoking again. The plaintiff was noted to be anxious and had multiple tender muscular trigger points bilaterally. Dr. Bridgeman diagnosed chronic pain syndrome, diabetes, anemia, asthma, and hypertension. Dr. Bridgeman reviewed and adjusted the plaintiff's medications and referred her to pain management (Tr. 355-57).

From August 11, 2011, to November 17, 2011, the plaintiff visited Carol Burnette, M.D., of Piedmont Comprehensive Pain Management, three times complaining of chronic generalized pain (Tr. 499-502). On August 11, 2011, the plaintiff reported a history of fibromyalgia and possible degenerative spine problems (Tr. 501). She also reported worsening pain that was possibly related to increased stress as she and her family had to move from her grandmother's house to an apartment in the area (Tr. 500). She also had a history of diabetes and may have had some delay in gastric emptying in relation to her diabetes, but her sugars were stable (Tr. 499). On examination, Dr. Burnette noted that

11

the plaintiff was alert, well oriented, and in no acute distress; she ambulated independently with minimal start-up pain; she had no peripheral edema or synovitis; she had mild restricted motion in her back; she had negative bilateral straight leg raise tests; she had normal motor tone in all extremities; and she had slightly altered sensation in her distal extremities (Tr. 499-502). X-rays of the plaintiff's cervical and lumbar spine on August 11, 2011, showed mild degenerative disc disease with mild bony right neuroforamina narrowing at C4-C5, and mild degenerative facet arthropathy at L5-S1 with mild degenerative joint disease in the SI joints (Tr. 492-93). She was assessed with chronic generalized pain with a history of fibromyalgia and probable diabetic peripheral neuropathy, chronic non-restorative sleep and associated fatigue; possible hip bursitis; history of lumbar facet arthropathy and L5-S1 degenerative disc disease; and mild SI joint degenerative disc disease noted on x-rays. Dr. Burnette prescribed a trial of a Butrans patch and Lidoderm, Lortab, and encouraged the plaintiff not to smoke, to stretch and exercise as tolerated, and to pace herself with activities (Tr. 499-502).

On October 11, 2011, the plaintiff visited Dr. Alston-Johnson, complaining of weakness and fatigue (Tr. 481). Dr. Alston-Johnson noted that the plaintiff had a history of iron deficiency anemia, facial hematoma that presented after a fall, history of positive direct Coombs C3b/3d, and positive IgG with indirect negative (Tr. 481). X-rays of the plaintiff's face showed no fractures or bony lesions (Tr. 494). On examination, Dr. Alston-Johnson noted that the plaintiff had clear lungs and only trace edema in her ankle (Tr. 481-82). The plaintiff was prescribed folic acid and a high iron diet (Tr. 482).

On October 17, 2011, Dr. Bridgeman completed a mental questionnaire at the Commissioner's request, noting that the plaintiff had anxiety and depression and that she was prescribed medication that had helped these conditions. Dr. Bridgeman circled responses that the plaintiff was oriented to time, person, place, and situation; she had distractble thought process; she had suspicious thought content; she had

worrisome/anxious mood/affect; she had adequate attention/concentration; and she had adequate memory. Dr. Bridgeman circled a response that the plaintiff would have "serious" work related limitation in function due to her mental condition, but did not provide any comments to explain these work related limitations. He also indicated that the plaintiff would be able to manage her own funds if awarded benefits (Tr. 461).

On October 19, 2011, December 4, 2011, and January 12, 2012, the plaintiff visited Dr. Bridgeman (Tr. 527, 530-31, 533). Dr. Bridgeman noted that the plaintiff's asthma, depression, anxiety, and aches were stable, but her blood sugars while stable in October, were poorly monitored in January (Tr. 527, 533). In addition, the plaintiff presented to Dr. Bridgeman in December with acute bronchitis (Tr. 530-31). On examination, Dr. Bridgeman noted that the plaintiff had scattered wheezing, an anxious mood, multiple tender points, but no weakness or numbness in her lower extremities and negative straight leg-raising pain (Tr. 528, 533).

On October 25, 2011, State agency psychologist, Manhal Wieland, Ph.D., reviewed the plaintiff's medical records and completed a Psychiatric Review Technique form (Tr. 71-72). Dr. Wieland opined that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation (Tr. 71).

On the same day, Debra Price, Ph.D., a State agency psychologist, reviewed the plaintiff's medical records and completed a Psychiatric Review Technique form and Mental Residual Functional Capacity ("RFC") Assessment for prior to the plaintiff's date last insured of December 31, 2007 (Tr. 72-73, 77-79). Dr. Price opined that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation (Tr. 73). In assessing the plaintiff's mental RFC, Dr. Price

13

opined that the plaintiff could perform simple tasks without special supervision, maintain regular attendance, relate appropriately to supervisors and co-workers, make simple work related decisions, adhere to basic standards for hygiene and behavior, protect herself from normal workplace safety hazards, and use public transportation (Tr. 78).  On March 31, 2012, Craig Horn, Ph.D., affirmed Dr. Price's opinion as written (Tr. 119-20, 139-40).

On November 8, 2011, the plaintiff followed up with Dr. Alston-Johnson, complaining of nausea and cramping.  She denied any headaches or shortness of breath (Tr. 483).  On examination, Dr. Alston-Johnson noted that the plaintiff had clear lungs and no edema (Tr. 483).  The plaintiff was referred to Dr. Bridgeman for follow-up of her thyroid levels and recommendations regarding whether she needed to be treated for hypothyroidism.  Dr. Alston-Johnson also prescribed Reglan for treatment of possible gastroparesis (Tr. 484).

On November 17, 2011, Dr. Burnette reevaluated the plaintiff's chronic generalized pain.  The plaintiff reported a recent emergency room visit for increased pain and occasional nausea and vomiting. Her blood sugars were stable.  She had dysestesias, pins and needles, and numbness in her hands and feet.  The plaintiff said Lortab was helpful, but she needed to take more to get adequate relief.  Dr. Burnette indicated that the plaintiff ambulated independently with minimal start-up pain. The plaintiff's skin was slightly blotching and she had slightly altered sensation in the distal extremities.  The plaintiff also had mildly restricted motion in her back.  Dr. Burnette renewed the plaintiff's Lortab and added Butrans and Lidoderm patches and lidocaine cream.  Dr. Burnette encouraged the plaintiff not to smoke and to stretch and exercise as tolerated (Tr. 499).

On December 1, 2011, Adrian Corlette, M.D., a State agency physician, reviewed the plaintiff's medical records and opined that the plaintiff could perform light work with occasional postural activities and no concentrated exposure to hazards (i.e. machinery,

14

heights, etc…) (Tr. 74-77).   On March 27, 2012, Dale Van Slooten, M.D., affirmed Dr. Corlette's opinion as written (Tr. 121-23).

On December 14, 2011, Dr. Bridgeman evaluated the plaintiff for several days of cough, congestion, and wheezing.   The plaintiff had scattered chest wheezes and multiple tender muscular trigger points.  Dr. Bridgeman reviewed and renewed the plaintiff's medications and added Synthroid (Tr. 530-32).

The plaintiff visited C. Ruffin Stephenson, M.D., a rheumatologist, on January 9, 2012, for a consultative examination of her chronic pain syndrome.  The plaintiff reported that she had some improvement with Lortab and Lidoderm patches.  On examination, Dr. Stephenson noted that the plaintiff had a clear chest; she had normal reflexes; she had normal light touch and pinprick as well as vibratory sensation; she had a normal cervical spine; she had no synovitis or swelling in her wrists and hands, but diffuse tenderness; she walked with an antalgic gait, but was able to get up and down from the table fairly well; and she was tender everywhere.   Dr. Stephenson diagnosed diffuse musculoskeletal pain syndrome; previous diagnosis of peripheral neuropathy related to diabetes; exogenous obesity; apparent history of asthma; insulin dependant diabetes; and transaminases.  Dr. Stephenson noted that whether the plaintiff had fibromyalgia or chronic pain made no difference as there was nothing he could offer because she had been on a lot of different medications, but he did suggest trying Savella (used to treat fibromyalgia) and a good aerobic exercise program.  He recommended that the plaintiff continue seeing Dr. Burnette and that a sleep study could be considered (Tr. 525-26).

On January 12, 2012, Dr. Bridgeman reevaluated the plaintiff for body aches and lower leg bruising.  He noted that the plaintiff's asthma, depression, and aches were stable, and her blood sugars were poorly monitored.   Dr. Bridgeman indicated that the plaintiff had multiple tender trigger points bilaterally, scattered wheezing, and an anxious appearance.  He reviewed and adjusted the plaintiff's medications (Tr. 527-29).

On February 7, 2012, the plaintiff followed up with Gary Spitzer, M.D., in Dr. Alston-Johnson's clinic for her known iron-deficiency anemia. The plaintiff had a good response to Venofer with significant improvement in her blood counts. The plaintiff was given a prescription for oral iron, but if she was unable to tolerate the oral iron, she would receive IV iron. She was also encouraged to lose weight and start exercising on a daily basis (Tr. 579-80).

On April 12, 2012, Dr. Bridgeman noted that the plaintiff's asthma was stable, although she continued to smoke. Her anxiety and depression were stable, but she complained of frequent headaches (Tr. 654). On the same day, the plaintiff visited Dr. Burnette complaining of more pain in her back and legs in recent weeks and worsening migraines. She reported that her pain was so bad at times that she got nauseated and occasionally vomited (Tr. 657). On examination, Dr. Burnette noted that the plaintiff was alert, well oriented, briefly tearful but consolable. She had an antalgic gait with start-up pain; she had some tenderness in her lower back and SI joints. A straight leg raise test produced some pulling discomfort in the hamstrings. The plaintiff had diminished sensation distally in the extremities, and her skin color was slight cyanotic in her feet and blotchy in her legs and arms. Dr. Burnette encouraged efforts for the plaintiff to quit smoking and lose weight, and she prescribed a trial of Ambien and Imitrex, provided samples of Sumatriptan, and Zipsor (NSAID), and changed the plaintiff's prescription of Lortab to Norco (Tr. 657-58).

An MRI of the plaintiff's lumbar spine on April 17, 2012, was normal and showed no disc herniation or compressive discopathy, no congenital abnormalities, and no acute vertebral body marrow edema (Tr. 659).

On July 12, 2012, the plaintiff followed up with Dr. Burnette for generalized pain and to review her MRI results. The plaintiff reported that she got some relief from Norco, and while she still had migraines, she thought the previous samples of Sumatriptan were helpful. On examination, the plaintiff was alert, oriented, and in no acute distress; she

16

had some tenderness to palpation in the mid and lower back and sacroiliac area; her skin color remained blotchy in her legs and cyanotic in her feet; and she had a slightly antalgic gait. Dr. Burnette encouraged the plaintiff to quit smoking and lose weight, she gave the plaintiff a trial of Relafen, renewed Norco, and provided additional samples of Sumatriptan and Flector patches (Tr. 660).

On July 31, 2012, Dr. Bridgeman noted that the plaintiff's asthma was stable, and she had no other new concerns (Tr. 669). On examination, Dr. Bridgeman noted that the plaintiff was well developed, well nourished, and in no distress; she had scattered wheezing; she had an anxious mood; she had multiple tender points bilaterally; but she had no weakness or numbness in her lower extremities; she had negative straight leg-raising pain; and she had no focal neurologic deficits (Tr. 670).

On September 20, 2012, Dr. Burnette completed a Medical Source Statement (Physical) form indicating that the plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently; she could stand/walk for a total of four hours in an eight-hour workday; she could sit for a total of four hours in an eight-hour workday; she had occasional postural limitations; her ability to feel and push/pull were affected by her impairments; she had environmental limitations; and she would have trouble being reliable in terms of absences due to pain (Tr. 661-63). Dr. Burnette noted that she based her opinion on a combination of subjective complaints and a history of physical examinations (Tr. 663).

On October 11, 2012, the plaintiff had a follow-up with Dr. Burnette for chronic back and generalized pain. The plaintiff reported increased pain and restriction of motion in her shoulders and elbows, left greater than right. The plaintiff's gait remained slightly antalgic with start-up pain. Dr. Burnette refilled the plaintiff's Norco and Voltaren gel and added Flector and Lidoderm patches. She also gave the plaintiff samples of Alsuma for migraine headaches (Tr. 695-96).

17

From October 31, 2012, through January 16, 2013, the plaintiff visited Dr. Bridgeman monthly (Tr. 672-83). On October 31st, she was evaluated for uncontrolled blood sugar with increased thirst and urination. Her fibromyalgia and anxiety were unchanged. She was continued on her medications (Tr. 672-74). At a November 14, 2012, appointment, the plaintiff brought disability forms, and she reported that she felt her overall pain, balance issues, depression, and anxiety kept her from being able to sit, ambulate, bend, or lift for any substantial period of time, and her depression and anxiety created a mental fog that influenced her ability to concentrate and follow instructions (Tr. 675). Dr. Bridgeman completed a Medical Source Statement (Physical) regarding the plaintiff's limitations from 2009 to the present. He opined that the plaintiff could lift and carry less than ten pounds occasionally and frequently; she could stand/walk for a total of zero hours in an eight-hour workday; she could sit for a total of one hour in an eight-hour workday; she could never perform postural activities; her ability to reach, handle, feel and push/pull were affected by her impairments; she had environmental limitations; and she would have trouble being reliable in terms of absences due to pain (Tr. 664-66). Dr. Bridgeman noted that his opinion was confirmed by his observation and was based in part on the plaintiff's subjective complaints (Tr. 666). Regarding the plaintiff's ability to do work-related activities (mental), Dr. Bridgman indicated that the plaintiff would be unable to meet competitive standards or she had no useful ability to function in all functional areas (Tr. 667-68). Dr. Bridgeman also checked off a box that the plaintiff would be absent more than four days per month due to her impairments (Tr. 668). On examination, Dr. Bridgeman noted that the plaintiff was well developed, well nourished, and in no distress; she had scattered wheezing; she had an anxious mood; she had multiple tender points bilaterally; but she had no weakness or numbness in her lower extremities; she had negative straight leg-raising pain; and she had no focal neurologic deficits (Tr. 673, 676-77, 679, 682). The plaintiff was assessed with unchanged anxiety disorder; stable type II diabetes, unchanged chronic pain syndrome,

stable asthma, stable hypertension, unchanged hypercalcemia, unchanged peripheral neuropathy, and unchanged depression (Tr. 673-74, 677, 680, 683).

On December 19, 2012, Dr. Bridgeman evaluated the plaintiff and indicated that she was "still hobbled by fibromyalgia." The plaintiff reported being unable to sleep or stand for any length of time and having difficulty with lifting and bending. Dr. Bridgeman indicated that the plaintiff's diabetes, asthma, hypertension, peripheral neuropathy, and depression were stable. He reviewed and renewed her medications (Tr. 678-80).

On January 10, 2013, the plaintiff followed up with Dr. Burnette complaining of pain in her left shoulder. The plaintiff reported having trouble lifting her arm due to pain. Dr. Burnette started her on MS Contin, refilled her Norco, and ordered an MRI (Tr. 695, 697). The MRI of the plaintiff's left shoulder on January 15, 2013, showed a superior labral tear from anterior to posterior ("SLAP tear"), subacromial-subdeltoid bursal fluid, but no rotator cuff tear (Tr. 698). On January 16, 2013, the plaintiff was evaluated by Dr. Bridgeman for follow-up of her multiple chronic conditions (Tr. 681-83).

On February 5, 2013, the plaintiff visited Paige Gault, M.D., an endocrinologist, for evaluation of type II diabetes (Tr. 684). On examination, Dr. Gault noted that the plaintiff was well developed, well nourished, and in no acute distress; she had clear lungs; she had normal posture and gait, she had no clubbing, cyanosis, or edema; she had no focal deficits; she had intact cranial nerves; she had normal reflexes, coordination, strength, and tone; she was alert and cooperative; she had a normal mood and affect; and she had normal attention span and concentration (Tr. 686-87). The plaintiff was diagnosed with uncontrolled type II diabetes and diabetic peripheral neuropathy (Tr. 688). Dr. Gault suspected that the plaintiff was not taking her reported doses of insulin. The doctor was not clear whether the plaintiff's pain symptoms were from diabetic neuropathy or from fibromyalgia (Tr. 684-94).

The plaintiff returned to Dr. Burnette monthly from March 2013 through May 2013 (Tr. 699-702).  On March 7th, Dr. Burnette noted that the plaintiff remained under a lot of stress but seemed to be coping better and was in better spirit.  On examination, Dr. Burnette noted that the plaintiff was alert, well oriented, and in no acute distress; she had grossly normal gait and station with mild start-up pain; she had some tenderness in her left shoulder and lower back; and her shoulder motion was more restricted on her left than her right.  Dr. Burnette noted that the plaintiff reported continued severe shoulder pain.  She recommended an orthopedic evaluation.  A urine screen showed a trace amount of marijuana.  Dr. Burnette stated that the plaintiff appeared more stressed and was "a little flush" in her face. The plaintiff reported more severe aching throughout her body.  She had pain getting up from a seated position and had a slightly antalgic gait.  The plaintiff's pain medication was refilled, since she reported it improved her quality of life (Tr. 699-700)

On April 4, 2013, Dr. Burnette recommended follow-up with Dr. Bridgeman about switching Effexor to Cymbalta.  Dr. Burnette gave the plaintiff Alsuma samples and prescribed Imitrex for her migraine headaches.  Dr. Burnette refilled fentanyl patches and oxycodone.  Dr. Burnette recommended weight loss and smoking cessation (Tr. 700-01).

On April 25, 2013, Dr. Bridgeman noted multiple tender muscular tender points in the plaintiff's back.  The plaintiff's numerous chronic conditions were stable (Tr. 714-16).  On May 1, 2013,the plaintiff complained of low back pain, abdominal pain, and blood in her urine.  Dr. Bridgeman diagnosed a urinary tract infection and lumbago (Tr. 711-13).

On May 30, 2013, Dr. Burnette noted back, shoulder, and generalized pain, and noted the plaintiff had not gotten any relief from her recent cortisone injection.  The plaintiff continued to have tenderness in her shoulders and lower back.  Dr. Burnette indicated that the plaintiff's shoulder motion also remained limited, left greater than right.  The plaintiff's prescriptions for fentanyl patches and oxycodone were refilled (Tr. 699).

20

On June 10, 2013, the plaintiff complained of increased allergies and asthma to Dr. Bridgeman. Dr. Bridgeman noted that the plaintiff's blood pressure and blood sugars were stable (Tr. 705). On examination, Dr. Bridgeman noted that the plaintiff had clear lungs and no CVA tenderness in her back (Tr. 706). She prescribed allergy medication and referred the plaintiff for allergy testing (Tr. 705-07)

On September 13, 2013, Dr. Burnette opined that the plaintiff would be limited to no more than sedentary work with occasional bilateral use of her hands, and she would have difficulty keeping up with a production pace (Tr. 723).

***Administrative Hearing Testimony***

The plaintiff testified that she remained able to prepare simple meals, shop for groceries, do some light housecleaning, wash laundry, tend to her personal hygiene, take care of her son, go out to eat at restaurants, and read the Bible (Tr. 53, 55, 57-58). She reported that although she had asthma, she was never hospitalized for it, and she continued to smoke cigarettes until a few months before the hearing (Tr. 56, 59).

***Vocational Expert Testimony***

At the administrative hearing, the ALJ sought testimony from an impartial vocational expert ("VE") to determine whether the plaintiff was capable of performing her past relevant work or other work that existed in significant numbers in the national economy (Tr. 60-64). The VE testified that the plaintiff could not perform her past work, but a hypothetical individual of the plaintiff's age, education, work experience, and the RFC to perform simple, one-to-two step, light work with occasional stooping, kneeling, crouching, crawling, and climbing ladders, scaffolds, and ropes, no more than frequent use of fingers for manipulation and handling objects, who must avoided concentrated exposure to fumes and hazards, could perform the representative occupations of clerk, cashier, and cleaner/housekeeper (Tr. 61-62).

## ANALYSIS

The plaintiff was 30 years old on the alleged onset date of disability and 39 years old at the time of the ALJ's decision. She has the equivalent of a high school education and past relevant work as a secretary. The relevant period for the plaintiff's DIB claim begins on her alleged onset date of December 3, 2003, and ends on her date last insured of December 31, 2007 (Tr. 11, 177). *See* 20 C.F.R. § 404.131(a) (stating that claimant bears the burden to prove her impairment became disabling prior to the date on which her insurance status expired). The relevant period for the plaintiff's SSI claim is from her August 2011[2] application date through the date of the ALJ's decision on October 18, 2013 (Tr. 9-29, 184-90). *See* 20 C.F.R. § 416.202 (explaining that a claimant is not eligible for SSI until, among other factors, the date she files an application for SSI benefits); 20 C.F.R. § 416.501 (stating that a claimant may not be paid SSI for any time period that precedes the first month she satisfies the eligibility requirements, which cannot predate the date on which an application was filed).

The plaintiff argues that the ALJ erred by failing to properly consider the opinions of her treating physicians. The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650,

---

[2]The parties cite August 1, 2011, as the date of the plaintiff's SSI application (doc. 15 at 2 n.1; doc. 14 at 5), and the ALJ stated in his decision that the SSI application date was August 9, 2011 (Tr. 9). However, the date on the application in the record is August 12, 2011 (Tr. 184-90). It does not appear that the discrepancy in dates has any bearing on the issues in this case.

654 (4th Cir. 2005).  However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

### Dr. Burnette

On September 20, 2012, Dr. Burnette completed a Medical Source Statement (Physical) form indicating that the plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently; she could stand/walk for a total of four hours in an eight-hour workday; she could sit for a total of four hours in an eight-hour workday; she had occasional postural limitations; her ability to feel and push/pull were affected by her impairments; she had environmental limitations; and she would have trouble being reliable in terms of absences due to pain.  Dr. Burnette noted that she based her opinion on a combination of subjective complaints and a history of physical examinations (Tr. 661-63).

23

On September 13, 2013, Dr. Burnette opined that the plaintiff would be limited to no more than sedentary work due to diabetic peripheral neuropathy in her lower extremities. She would be able to use her bilateral hands occasionally due to neuropathy in her hands. Dr. Burnette further opined that the plaintiff's chronic pain from arthritis and fibromyalgia would cause interruption to her concentration making it difficult to keep up with a production pace (Tr. 723).

The ALJ gave Dr. Burnette's opinions "little weight" and explained his reasons for doing so (Tr. 26-27). First, the ALJ explained that the opinion was inconsistent with Dr. Burnette's own examination findings; in particular, while Dr. Burnette opined that the plaintiff would be limited to sedentary work because of a limited ability to stand and walk, Dr. Burnette noted on examination in May 2013 that the plaintiff's gait and station were grossly within normal limits with mild start-up pain (Tr. 27; *see* Tr. 499-502, 699-700). *See* 20 C.F.R. §§ 404.1527(c)(3-4), 416.927(c)(3-4) (explaining that the weight an opinion receives depends on the degree a physician presents relevant evidence "particularly medical signs and laboratory findings" as well as its consistency with the record as a whole). In addition, as noted by the ALJ, Dr. Gault, the plaintiff's treating endocrinologist, noted in February 2013 that she had normal posture and gait with no focal neurologic deficits and normal reflexes, coordination, strength, and tone (Tr. 27; *see* Tr. 686-87). While the plaintiff argues that there was also evidence in the record showing that her gait was antalgic at times (pl. brief at 22-23), the ALJ specifically considered such evidence (*see* Tr. 19), but found that the evidence supported a finding that the plaintiff had the ability to perform work within the assessed residual functional capacity ("RFC"). Under the substantial evidence standard, the court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for the ALJ. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). Moreover, as the ALJ noted, Dr. Burnette's opinion in September 2013 that the plaintiff would not be able to use her hands bilaterally any more than occasionally

24

due to neuropathy in her hands, a limitation Dr. Burnette stated had been present since she first started seeing the plaintiff, was inconsistent with Dr. Burnette's opinion in September 2012 that the plaintiff would have no restrictions in reaching and handling (Tr. 27; *see* Tr. 662, 723). Further, as the ALJ noted, Dr. Burnette's opinions were inconsistent with her more recent progress reports (Tr. 27; *see* Tr. 695, 697, 699-702) indicating that the plaintiff's conditions have been relatively stable and controlled with treatment. Specifically, in April 2013, Dr. Burnette noted that fetanyl patch and oxycodone were helpful for the plaintiff's pain (Tr. 20; *see* Tr. 700), and in May 2013, Dr. Burnette noted that the plaintiff had some relief from migraines with Imitrex (Tr. 22; *see* Tr. 699). While the plaintiff is correct that Dr. Burnette did not state specifically that the plaintiff's impairments were controlled with treatment, the ALJ did not err in considering the extent to which the plaintiff's pain could be controlled by medication.

The undersigned finds that the ALJ's decision to give Dr. Burnette's opinions "little weight" is supported by substantial evidence and is free of legal error. Furthermore, the fact that the ALJ did not fully adopt or give significant weight to Dr. Burnette's opinion did not mean that the he failed to understand or give credit to the evidence. As evidenced by the RFC finding, the ALJ accepted that the plaintiff was limited to some degree by her symptoms, including pain, but not to the extent opined by Dr. Burnette such that she would be precluded from all work activity (Tr. 18-28). As the ALJ stated, "Let there be no misunderstanding the claimant has significant impairments[,] and while I may not have articulated all of the evidence of record[,] the severity of her conditions and findings on examination persuaded me that she was significantly limited as set forth in my [RFC]" (Tr. 22-23).

### Dr. Bridgeman

On November 14, 2012, Dr. Bridgeman completed a Medical Source Statement (Physical) regarding the plaintiff's limitations from 2009 to the present. He

25

opined that the plaintiff could lift and carry less than ten pounds occasionally and frequently; she could stand/walk for a total of zero hours in an eight-hour workday; she could sit for a total of one hour in an eight-hour workday; she could never perform postural activities; her ability to reach, handle, feel and push/pull were affected by her impairments; she had environmental limitations; and she would have trouble being reliable in terms of absences due to pain. Dr. Bridgeman noted that his opinion was confirmed by his observation and was based in part on the plaintiff's subjective complaints. Regarding the plaintiff's ability to do work-related activities (mental), Dr. Bridgeman indicated that the plaintiff would be unable to meet competitive standards or she had no useful ability to function in all functional areas. Dr. Bridgeman also checked off a box that the plaintiff would be absent more than four days per month due to her impairments (Tr. 664-68).

The ALJ considered Dr. Bridgeman's opinion and gave it "no weight" (Tr. 24-26). The ALJ first explained that Dr. Bridgeman's opinions were inconsistent with Dr. Bridgeman's own examination findings. Specifically, Dr. Bridgeman reported that the plaintiff had clear normal respiratory effort or only scattered wheezing, despite continuing to smoke; she had no weakness or numbness; she had negative straight leg raise tests; and she had no neurologic deficits (Tr. 26; *see* Tr. 424, 426, 428, 528, 533, 654, 670, 673, 676-77, 679, 682, 706). In addition, as the ALJ noted, Dr. Bridgeman's opinion as to the plaintiff's inability to stand or walk for any length of time was inconsistent with Dr. Burnette's September 2012 opinion and the opinions of the State agency physicians (Tr. 26; *see* Tr. 74-77, 121-23, 661). Dr. Bridgeman's opinion that the plaintiff could only sit for an hour in a normal workday was also inconsistent with Dr. Burnette's opinions and the opinions of the State agency physicians (Tr. 75, 121, 662).

With regard to the plaintiff's mental limitations, the ALJ found that Dr. Bridgeman's opinion was inconsistent with the plaintiff's "longitudinal history of treatment" (Tr. 26), which included treatment notes from several physicians stating the plaintiff was

26

alert and oriented; she was cooperative; she had a normal mood and affect; and she had normal attention span and concentration (Tr. 499-502, 657, 660, 686-87, 699-700). As the ALJ also noted, Dr. Bridgeman's "reports refer to conditions which have been relatively stable and controlled with conservative treatment" (Tr. 26). For example, the plaintiff was noted by Dr. Bridgeman as having stable anxiety and depression (Tr. 424, 527, 533, 654). Dr. Bridgeman's opinion was also inconsistent with the plaintiff's report that she could follow written and oral instructions fairly well, and she got along with authority figures well (Tr. 231-32, 266-67). The ALJ found that the evidence, including the plaintiff's testimony regarding her level of functioning, was consistent with a mental impairment "that may cause difficulty sustaining concentration and pace on complex tasks and detailed instructions. She should, however, be able to attend to perform simple tasks" (Tr. 22).

In assessing Dr. Bridgeman's opinion, the ALJ also noted that the opinion was "based, at least in part, on what the claimant reported to him" and that the opinion was "overly sympathetic to the claimant" (Tr. 26). *See Craig v. Chater*, 76 F.3d 585, 589–90 (4th Cir.1996) (upholding rejection of treating physician's opinion where ALJ opined that doctor's opinion was based on "claimant's subjective symptoms," not supported by "clinical findings or laboratory test results," and contradicted by physician's office notes). It appears to the undersigned that the ALJ only noted that Dr. Bridgeman's opinion was overly sympathetic to the plaintiff in light of the previously set out inconsistencies with the record (Tr. 26). However, even assuming the ALJ erred in making this statement, such error was at most harmless as the ALJ gave several valid reasons for discounting the opinion. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

Based upon the foregoing, the undesigned finds that the ALJ properly considered Dr. Bridgeman's opinion, and this allegation of error is without merit.

### State Agency Physicians

In making the RFC finding, the ALJ "relied heavily" on the assessments of the State agency medical and psychological consultants (Tr. 27-28). Specifically, on December 1, 2011, Dr. Corlette, a State agency physician, reviewed the plaintiff's medical records and opined that the plaintiff could perform light work with occasional postural activities and no concentrated exposure to hazards (i.e. machinery, heights, etc…) (Tr. 74-77), and on March 27, 2012, Dr. Van Slooten affirmed Dr. Corlette's opinion as written (Tr. 121-23). Furthermore, on October 25, 2011, State agency psychologist Dr. Wieland opined that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation (Tr. 70-72). On the same day, State agency psychologist Dr. Price opined that the plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation (Tr. 73). In assessing the plaintiff's mental RFC, Dr. Price opined that the plaintiff could perform simple tasks without special supervision, maintain regular attendance, relate appropriately to supervisors and co-workers, make simple work related decisions, adhere to basic standards for hygiene and behavior, protect herself from normal workplace safety hazards, and use public transportation (Tr. 78). On March 31, 2012, Dr. Horn affirmed Dr. Price's opinion as written (Tr. 119-20, 139-40).

The plaintiff argues that the ALJ erred in giving more weight to the opinions of the State agency consultants because their opinions were "based on a critically incomplete record" (pl. brief at 30). Specifically, the State agency medical and psychological consultants did not have the opinions of Drs. Burnette and Bridgeman when

28

they made their assessments (*id.*).  The ALJ was required to consider the State agency physician assessments as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled.").  Further, an ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at \*6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012).

Here, the ALJ stated several times that he considered the entire record (Tr. 9, 11, 14, 18, 22-23), and he discussed the medical and other evidence in detail (Tr. 13-28). Furthermore, the ALJ gave several reasons for his reliance on Drs. Corlette's and Van Slooten's opinions that the plaintiff was capable of a limited range of light work. Specifically, "[b]oth physicians articulated a detailed and thorough review of the medical evidence, policy issues and provided a rationale in support of their respective opinions which is consistent with the evidence of record" (Tr. 27; *see* Tr. 74-77, 120-23).  The ALJ also cited the evidence of record showing that the plaintiff's gait and station were grossly normal, she was raising a young child, an MRI of the lumbar spine failed to reveal an underlying condition to generate the pain of which she complained, straight leg raise tests were repeatedly noted to be normal, neurologic examinations were reported to be negative, asthma and neuropathy were reported as stable, her diabetes was reported on occasion as without complication, and the musculoskeletal system was reported as normal (Tr. 27). Moreover, the ALJ stated as follows with regard to his reliance on the State agency psychologists' opinions that the plaintiff was capable of simple repetitive tasks:  "[T]hese

29

opinions [are] well supported by the evidence which has been set forth . . . above as well as the mental longitudinal history which also has been set forth in this decision" (Tr. 28; *see* Tr. 70-73, 78).

Based upon the foregoing, the undersigned finds that the ALJ's reliance on the opinions of the State agency medical consultants was not in error and was based upon substantial evidence. *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir.1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

April 9, 2015
Greenville, South Carolina